UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HAROLD C. ROBINSON, et al.,

          Plaintiffs,

    v.

OPEN TOP SIGHTSEEING SAN
FRANCISCO, LLC,

          Defendant.

Case No. 14-cv-00852-PJH

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This is a wage and hour case that was originally filed in state court on November 26, 2013, then removed to federal court on February 26, 2014. Dkt. 1. This matter was tried for the purposes of liability before a jury for a period of three days commencing October 2, 2017. The court then held a one day bench trial on October 10, 2017. In lieu of closing arguments at the bench trial, the parties submitted post-trial briefs.

## BACKGROUND

Plaintiffs Harold Robinson, Jr., a former employee of Open Top, and Lawrence Muse, a current employee of Open Top ("plaintiffs") represent three overlapping certified classes of former or current bus operators for defendant Open Top Sightseeing San Francisco, LLC ("defendant" or "Open Top"). First, the court certified three Rule 23 subclasses. A California subclass consisting of current or former Open Top bus operators employed by Open Top any time on or after November 26, 2010. This subclass relates to the waiting time penalties and accurate wage statement causes of action. Dkt. 95 at 2. A Section 17200 subclass consisting of current or former Open Top bus operators employed by Open Top on or after November 26, 2009. This subclass

1  relates to the claim brought under California Business and Professions Code § 17200

2  ("the UCL"). An injunctive relief subclass consisting of all people employed by Open Top

3  as a bus operator. This subclass relates to claims for injunctive relief. Second, there is a

4  Fair Labor Standards Act (the "FLSA") collective action consisting of 29 plaintiffs. Third,

5  there is a "PAGA" representative action consisting of 23 plaintiffs who are making claims

6  for missed rest breaks. The subclass or collective action that each plaintiff is a member

7  of is shown in the parties' Joint Pretrial statement, Exhibit A, Dkt. 165. See also Dkt. 115

8  at 2:7-19 (reciting definitions of the Rule 23 subclasses); Dkt. 51 (certifying FLSA

9  collective action).

10  Open Top is a tour bus company providing "hop on/hop off" sightseeing bus tours

11  in the San Francisco Bay Area using double-decker, open-top buses.

12  Plaintiffs allege a number of wage and hour violations. The operative second

13  amended complaint filed May 21, 2014, contains ten claims, but only six remained in the

14  case at the beginning of trial: (1) violations of the FLSA for failure to pay overtime; (2)

15  failure to provide accurate wage statements under California Labor Code § 226 and

16  Wage Order 9; (3) waiting time penalties under California Labor Code §§ 201–203; (4)

17  failure to provide rest breaks under California Labor Code § 226.7; (5) violations of the

18  UCL, California Business and Professions Code § 17200; and (6) violations of the Private

19  Attorneys General Act ("PAGA"), § 2699. See Dkt. 23; Dkt. 95 at 2 n.1.

20  On May 24, 2017, the court granted plaintiffs' motion for summary judgment on

21  Open Top's liability on the overtime claim under the FLSA, the UCL claim (predicated on

22  the FLSA overtime claim) with a four-year statute of limitations, the California Labor Code

23  Section 203 claim (waiting time penalties), and the claim for liquidated damages under

24  the FLSA. See generally Dkt. 154.

25  On September 7, 2017, after the pretrial conference, the court granted plaintiffs'

26  motion to bifurcate the trial. Dkt. 200. The jury trial phase was set to address willfulness

27  under the FLSA, liability on the rest break claim for more than 10 operators, and Open

28  Top's liability for issuing wage statements that failed to include all applicable overtime

2

worked and Open Top's full legal name. Dkt. 200. The second phase would be conducted as a bench trial and address PAGA liability, all damages and penalties, and injunctive relief. Dkt. 200.

In accordance with discussion with the parties, the pretrial order set aside 7 days for the jury trial, beginning on October 2, 2017. Dkt. 200. The court allocated approximately 30 hours of time, of which 17 hours was allotted for plaintiffs and 13 for defendant. Dkt. 200. The court also set an 8-hour bench trial for October 26, 2017. Dkt. 200.

The parties stipulated to the following undisputed facts for incorporation into the trial record:

- Defendant did not pay overtime to operators until May 1, 2016;
- Up until May 1, 2016, defendant's wage statements did not display operators' overtime rates;
- Up until May 1, 2016, defendant's wage statements did not reflect all hours above 40 hours in a week as being overtime hours;
- Up until May 1, 2016, defendant's wage statements inaccurately characterized bonus pay as overtime;
- Defendant's payroll records are authentic and admissible to show the amounts that Open Top paid to operators for the time periods covered by those records; and
- Defendant has never paid an operator for a missed rest break because, according to defendant, no operator has ever missed a rest break.

Dkt. 165 at 4.

**A.    Jury Trial**

On Monday, October 2, 2017, before voir dire, the court noted that plaintiffs planned on calling only four live witness and presenting the video depositions of two other witness. This plan represented a significant reduction from the dozens of witnesses plaintiffs originally listed in their pretrial disclosures. In fact, it also represented a

significant reduction from plaintiffs' counsel's representations at the pretrial conference, where plaintiffs stated they expected to call at least 7 additional witnesses just on the topic of rest breaks. Defense counsel stated that defendant would call three live witnesses and possibly rebuttal witnesses.

Given this change in circumstance, the court noted that with the reduced witness list the trial was likely to be much shorter than the time allotted and suggested that the revised estimate be provided to prospective jurors. Plaintiffs agreed to some extent, stating that it was "possible it could be done this week or possibly going into just one or two days of next week." Trial Tr. 14:1-13. Defense counsel stated its intention to use the full 13 hours allotted to his client, so a jury was empaneled for a two week trial.

After the jury was selected, opening statements began a little after 1:00 P.M. Not even three hours later, plaintiffs concluded their case-in-chief at about 3:50 P.M. with the exception of submitting documents into evidence.

While surprising given plaintiffs' counsel's representations earlier that same day, counsel's expeditious completion of plaintiffs' case-in-chief was unsurprising in light of plaintiffs' counsel's approach to trial. Plaintiffs' counsel tried the case as though there were significant stipulated facts in the record or significant limitations on evidence or significant time constraints, and operated, it seemed, as if the jury had significant prior knowledge of the case. Plaintiffs presented a paltry amount of evidence related to their rest break claim, used only a handful of exhibits (out of the dozens that were designated for use), and plaintiffs' witnesses barely testified on those exhibits that were used. In lieu of calling live witnesses, plaintiffs showed a number of hours of videotaped deposition testimony, and for many of plaintiffs' exhibits, the jurors were not shown the exhibit in conjunction with testimony on the exhibit.

Defendant's case and closing arguments took about one and a half days. Defendant called five witnesses and, including plaintiffs' cross examination, used a total of about seven hours.

The jury's verdict was published on October 5, 2017. The jury returned a verdict

1   that Open Top's violation of the FLSA was willful, that Open Top did not fail to provide

2   rest breaks, and that Open Top knowingly and intentionally failed to provide operators

3   with accurate wage statements because the wage statements failed to set forth the

4   applicable overtime worked and Open Top's full legal name.  Dkt. 220.

5           Because the parties completed the jury trial several days early, the court advanced

6   the bench trial to October 10, 2017.

7   **B.      Bench Trial**

8           Shortly before the bench trial, the parties notified the court that the parties had

9   stipulated to $410,000 in damages for plaintiffs' UCL overtime claim.  Dkt. 224.

10          The October 10, 2017 bench trial was litigated just as cursorily as the jury trial.

11  Despite the court setting aside an entire day for the bench trial, the parties presented

12  their damages and PAGA liability case in under two-and-a-half hours.

13          The only exhibit admitted into evidence during the bench trial was Exhibit 78,

14  which sets out the operators' termination dates that plaintiffs' expert used to calculate

15  § 203 waiting time penalties.  Bench Tr. 55:18-56:22.

16          Towards the end of the bench trial, plaintiffs offered Exhibit 11 into evidence.  By

17  plaintiffs' own admission, Exhibit 11 contained raw, voluminous payroll data that the

18  experts had relied on.  Plaintiffs did not attempt to present any testimony on Exhibit 11,

19  the experts never specifically mentioned Exhibit 11, and neither expert summarized or

20  explained the contents of Exhibit 11.  The parties, however, agree that a previous

21  stipulation deemed "defendant's payroll records [ ] authentic and admissible to show the

22  amounts that Open Top paid to operators for the time periods covered by those records."

23  Bench Tr. 59:3-23; see also Bench Tr. 56:25-59:24.  Defendant did not object to the

24  experts' reliance—to whatever extent that was—on those records.  See Bench Tr. 59:18-

25  23.

26          The record reflects that the court neither explicitly admitted nor refused to admit

27  Exhibit 11 into evidence.  Bench Tr. at 56:25-59:24.  Instead, the court attempted, to no

28  avail, to ascertain why a summary witness was not called to explain the voluminous

records particularly given that the expert did not offer any testimony on the records. Subsequent to trial and after receipt of the post-trial briefs, the court struggled with plaintiffs' damages calculations which were not entirely consistent with the summary evidence that had been admitted and turned to the payroll records contained in Exhibit 11 to try to make sense of the calculations. Given the lack of clarity as to the status of Exhibit 11, the court informed the parties on November 17, 2017, that the court was inclined to reopen the record to admit Exhibit 11 into evidence because it added to the court's understanding of the statistical evidence presented at trial. Dkt. 235. In the same notice, the court informed the parties that if admitted, as no summary was provided, the court would rely on Exhibit 11 only to the extent the court understood its contents.

The court allowed the parties to file objections to the court's stated intention. Defendant objected. Plaintiffs responded to that objection but did not lodge any objection themselves. Having considered defendant's objection and good cause appearing, in light of the parties' stipulation that the payroll records contained in the exhibit were authentic and admissible, the court hereby overrules defendant's objection and admits Exhibit 11 into evidence.

During the bench trial, the only two witnesses were plaintiffs' purported expert witnesses, Aaron Woolfson and Jeff Petersen. As is typical with expert reports, the court did not admit Petersen's and Woolfson's expert reports or related attachments into evidence. During the bench trial, however, both witnesses testified and relied upon their reports as demonstrative exhibits and to refresh their recollection on numerous topics. See, e.g., Bench Tr. 11:13-13:2 (reviewing report to refresh recollection); Bench Tr. 46:2-20 ("I'm going to read from my report on paragraph 31 on page 7 . . ."). Attached to Petersen's supplemental expert report were nine tables showing the amount of damages, penalties, or interest that Petersen calculated each operator was due. Like the rest of his report, Petersen reviewed and relied upon these tables extensively when testifying. See, e.g., Bench Tr. 36:5-23 (referring to tables); Bench Tr. 45:12-46:1 (same). Though the court did not admit the expert reports and related attachments into evidence, during the

bench trial, the court reviewed the reports and attachments both independently and in conjunction with witness testimony on the same. See, e.g., Bench Tr. 11:15-12:17. After the bench trial concluded, the court retained these demonstrative exhibits and subsequently relied on the reports and attachments primarily for the purpose of completing the mathematical calculations described below. The reports are referred to herein by name.

### 1.     Woolfson's Testimony

Plaintiffs offered Woolfson as an "expert with respect to structuring data" to "establish[] the foundation" for Petersen's testimony. Bench Tr. 20:13-22; Bench Tr. 19:22-20:2. The court refused to accept Woolfson as an expert because Woolfson failed entirely to show he had the appropriate credentials and explain exactly what task he performed for plaintiffs and how he completed that task. Bench Tr. 26:10-25. The court informed the parties, however, that Woolfson would be treated as a percipient witness. Bench Tr. 26:10-25. Although the court considered Woolfson's testimony as a percipient witness, his testimony was not particularly helpful and had little effect on the court's conclusions, especially in light of the court's admission of Exhibit 11 into evidence.[1]

### 2.     Petersen's Testimony

Petersen has a B.S. in economics, and a Ph.D. in economics from the University of Utah. Amongst other qualifications, Petersen completed a health economics training program at University of California, Berkeley as part of his post-doctoral fellowship, is a professor at St. Mary's College in Moraga, is on the board of the American Academy of Economic and Financial Experts, and has experience conducting surveys and using inferential statistics similar to the techniques he used in this case. See Bench Tr. 27:15-28:3. The court accepted Petersen as an expert in the area of economics. Bench Tr. 28:4-10.

---

[1] Defendant argues that because Woolfson is an unreliable expert, there is no foundation for Petersen's analysis. Given the discussion below and the court's receipt of Exhibit 11 into evidence, the court finds it unnecessary to rule on this argument.

1    Petersen testified that he analyzed summaries of payroll data to calculate

2    damages and penalties covering the period November 26, 2009, through April 30, 2016.

3    Bench Tr. 36:5-37:2.

4        For the period in which payroll data was available, March 7, 2011 through April 30,

5    2016 (the "payroll period"), Petersen testified he used actual payroll data.  Bench Tr.

6    37:11-38:4.  Petersen also testified that Woolfson apportioned the total hours for each

7    payroll period between the two separate weeks in that payroll period.   Bench Tr. 37:13-

8    38:4.  Looking at this data, Petersen determined first whether a threshold of 40 hours per

9    week had been crossed and, if so, calculated the overtime due.  He calculated overtime

10   due by multiplying the "hours worked in excess of 40 during a specific work week" "by the

11   hourly wage and then multipl[ied] that by .5."  Bench Tr. 36:5-11; see also Bench Tr.

12   69:23-70:16.  Petersen testified that this calculation covered 88 drivers who had payroll

13   data for work occurring after March 7, 2011.  Bench Tr. 92:17-93:12.

14       No payroll data was available for the period November 26, 2009, through March 6,

15   2011 (the "non-payroll period").  Bench Tr. 37:11-13.  For this period Petersen used

16   "inferential statistical methods" to extrapolate how many hours in excess of 40 each

17   driver worked per week.  Bench Tr. 31:11-13.  The inferential statistical method entailed

18   using available payroll data to project (here, determine an average) overtime hours per

19   week for the non-payroll period.  Petersen first calculated the average payment of

20   overtime that was due per year of work for those drivers where payroll data was

21   available.  This amount was $4,286 with a margin of error of 4.7%, which was low in

22   Petersen's opinion.  Next, Petersen adjusted the average overtime due per year to

23   account for the change in hourly wage between the payroll period ($18.86/hour) and the

24   non-payroll period ($17.00/hour).  Petersen accordingly reduced the average yearly

25   overtime premium to $3,863.  See generally Bench Tr. 41:16-45:18.

26       Petersen "verified" this result by conducting a survey of individuals who had no

27   payroll data available.  Bench Tr. 43:10-12.  Petersen testified that there were twenty-two

28   individuals who worked outside of the payroll period.  Bench Tr. 44:20-22. Petersen

8

1   telephoned 13 of these people and 11 responded to the survey. Bench Tr. 45:1-6.

2   Survey respondents indicated that on average they worked approximately 66 hours per

3   week. Bench Tr. 44:9-13. In comparison, the methodology described above projected

4   that non-payroll period drivers worked an average of 8.73 overtime hours per week

5   (48.73 hours per week). Bench Tr. 43:6-9. Petersen testified that the survey result,

6   therefore, showed the inferential methodology yielded a conservative result. Bench Tr.

7   44:17-19.

8       Petersen testified that he used the inferential statistical method to determine

9   overtime for twenty-two individuals. Bench Tr. 44:2-22. The court, however, notes that

10   Petersen's testimony on this matter is inconsistent. Petersen also testified that eighty-

11   eight of ninety-six class members had payroll data and that for those eighty-eight people

12   no extrapolations or averages were used. Bench Tr. 92:23-93:6. And some of the same

13   drivers appear on both Table 1 (with payroll data) and Table 3 (without payroll data) of

14   Petersen's Report. Further muddying the water, Petersen's expert report shows that he

15   calculated overtime due for only 16 individuals where payroll data was unavailable. <u>See,</u>

16   <u>e.g.</u>, Petersen Report Tables 3 and 4A.

17       Petersen concluded that drivers with payroll data available were owed UCL

18   overtime premiums totaling $302,707 and non-payroll period drivers were owed overtime

19   premiums totaling $63,595, for a total of $366,302. Bench Tr. 36:12-15.[2] Petersen

20   calculated prejudgment interest based on these numbers. Bench Tr. 63:24-64:2.

21       Using a three-year statute of limitations based upon when each of the 29 collective

22   action members filed his or her opt-in, Petersen used the methodologies described above

23   to calculate the amount of FLSA overtime ($114,524) and liquidated damages ($114,524)

24   due. Bench Tr. 38:23-39:8, 41:4-8.

25

26   [2] The court notes that in their Joint Pretrial Statement filed August 10, 2017, the parties
stipulated that plaintiffs' expert calculated total overtime due as $369,307—$3,000 more

27   than the amount Petersen testified to during the bench trial. <u>See</u> Dkt. 165. Because
there is testimony supporting the $366,302 amount and because it was presented at trial

28   (as opposed to two months before trial), the court considers only the $366,302 amount.

Lastly, Petersen used the results from the above analysis to calculate penalties due under Labor Code § 203 (waiting time penalties for drivers who were terminated between November 26, 2010 and the beginning of trial), § 226(e) (inaccurate wage statements issued between November 26, 2012 to April 20, 2016), and § 2699 (waiting time and inaccurate wage statements calculated for the period December 22, 2012 to April 20, 2016). Bench Tr. 46:2-48:9. As discussed below, penalties under these sections are triggered by Open Top's failure to pay overtime. However, the amount of penalties under § 203, unlike §§ 226 and 2699, is not determined by how frequently Open Top failed to pay a driver overtime.

Other than stating a summary of the totals due for overtime and penalties under these sections, Petersen did not testify on any underlying data or provide any examples of his analysis. Though the court has now admitted Exhibit 11 showing, to some degree, the raw payroll data, no evidence has been submitted on how many violations of each Labor Code section occurred. For example, other than Petersen's opinion about the total dollar amount of the violations, there is no testimony about how many inaccurate wage statements have been issued, much less how many per driver.

## LEGAL STANDARD

"It is within the sound discretion of the trier of fact to select the formula most appropriate to compensate the injured party. The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits. [T]he fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." Marsu, B.V. v. Walt Disney Co., 185 F.3d 932, 938–39 (9th Cir. 1999) (internal citations and quotation marks omitted; alterations in original); Pulaski & Middleman, LLC v. Google, Inc., 802 F.3d 979, 989 (9th Cir. 2015) (following Marsu in a UCL action).

Where an employer fails to maintain accurate payroll records, an employee carries

his burden under the FLSA if he shows he performed work for which he was improperly compensated and produces some evidence to show the amount and extent of that work "as a matter of just and reasonable inference." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946), superseded by statute on other grounds as noted by Integrity Staffing Solutions, Inc. v. Busk, 135 S. Ct. 513, 516-17 (2014); see also Brock v. Seto, 790 F.2d 1446, 1448 (9th Cir. 1986); McLaughlin v. Seto, 850 F.2d 586, 589 (9th Cir. 1988). The Ninth Circuit has approved "approximated awards where plaintiffs can establish, to an imperfect degree of certainty, that they 'have performed work and have not been paid in accordance with the FLSA.' " Alvarez v. IBP, Inc., 339 F.3d 894, 914–15 (9th Cir. 2003). "In such instances, the only uncertainty is the amount of damage, not the fact that damages are due. Where an approximate award based on reasonable inferences forms a satisfactory surrogate for unquantified and unrecorded actual times, an approximated award is permissible." Id. (internal quotation marks, citations, and alterations omitted); see also Guifu Li v. A Perfect Day Franchise, Inc., No. 10-01189C, 2012 WL 2236752, at *12 (N.D. Cal. June 15, 2012).

Plaintiffs also seek statutory and civil penalties under various California Labor Code Sections. The relevant subsections state:

> **Section 203(a).** If an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days.

> **Section 226(e)(1).** An employee suffering injury . . . is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

> **Section 2699(f)(2) ["PAGA"].** For all provisions of this code except those for which a civil penalty is specifically provided, there is established a civil penalty for a violation of these provisions, as follows: . . . the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each

11

aggrieved employee per pay period for each subsequent violation.

The statutory amounts provided for in § 203(a) and § 226(e)(1) do not preclude recovery of civil penalties under § 2699. Civil "PAGA penalties are separate and apart from the actual damages that a Plaintiff may recover under other labor code sections." See Guifu Li, 2012 WL 2236752, at *17 (citing Thurman v. Bayshore Transit Management, Inc., 203 Cal. App. 4th 1112, 1144–48 (2012)). Where the Labor Code does not provide a civil penalty, the civil penalty stated in § 2699(f)(2) applies, but can be reduced by the court. See Cal. Lab. Code. § 2699(e)(2); see also In re Taco Bell Wage & Hour Actions, 2016 WL 2755938, at *6 (E.D. Cal. Apr. 8, 2016). Calculation of these penalties can be approximate, if it is otherwise based on reasonable inferences establishing the penalties owed to plaintiffs under PAGA. Guifu Li, 2012 WL 2236752, at *17. If civil penalties are recovered, seventy-five percent is distributed to the Labor and Workforce Development Agency, and the remaining twenty-five percent is distributed to the aggrieved employees. Cal. Lab. Code § 2699(i).

## EVIDENTIARY DEFICIENCIES

### A. The Factual Foundation

#### 1. The Court Cannot Rely On Petersen's Overtime Calculation.

"The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." Marsu, 185 F.3d at 938–39. Where an "approximate award based on reasonable inferences forms a satisfactory surrogate for unquantified and unrecorded actual times, an approximated award is permissible." Alvarez, 339 F.3d at 915; Brock, 790 F.2d at 1448.

Generally, the court finds that Petersen's methodology was reasonable, including the inferential statistical method. See also Guifu Li, 2012 WL 2236752, at *14 (approving a similar analysis by Petersen). And in most circumstances, the court might rely heavily on an expert's conclusions to determine whether the final award is a good approximation of damages. However, for the reasons discussed below, including Petersen's failure to

account for paid off-duty meal breaks, the court finds that Petersen's analysis does not yield a reasonable approximation of damages and, therefore, cannot be relied upon.

        **a.**      **Defendant Is Not Attempting To Offset Overtime Due Based On Open Top's Practice of Paying for Meal Breaks.**

As discussed, Petersen testified that he calculated overtime amounts due by multiplying the hours worked in excess of 40 by the hourly wage and then multiplied that number by 0.5. During cross examination, defendant questioned Petersen on whether Petersen accounted for the driver's taking paid but off-duty meal breaks at least once a day. Defendant insinuates that Petersen's failure to do so is fatal to his overtime calculation.

Plaintiffs argue that the Ninth Circuit has repeatedly rejected this argument because defendant cannot reduce overtime owed by the amount defendant paid drivers for off-duty meal breaks. The court agrees that a defendant cannot reduce the amount of overtime due by pointing to defendant's policy to pay its employees for meal breaks, the latter of which is not required under the FLSA. See Ballaris v. Wacker Siltronic Corp., 370 F.3d 901, 913 (9th Cir. 2004) ("[T]he use of paid lunch compensation to offset wages or overtime compensation due for hours worked is in direct violation of the express provisions of section 7(h)" of the FLSA.).

However, plaintiffs mischaracterize the thrust of defendant's cross examination. Open Top is not seeking an "offset" for meal breaks. Rather, Open Top argues that the fact that the operators were not working during their meal break should be taken into account when calculating how many overtime hours each operator actually worked. That is, for example, if a driver was at work from 9:00 A.M. to 6:00 P.M. and Open Top paid the driver for that entire period but also provided the driver with the required 30 minute off-duty meal break, then the number of hours "worked" would only be 8.5 hours, even though the driver was paid for 9 hours. In sum, defendant's argument is that for the purposes of calculating total overtime, Petersen used the number of hours the driver was paid (in the court's example, 9 hours), rather than the number of hours the driver actually

worked (in the example, 8.5 hours). If this error is present, then Petersen's calculation systematically overestimates the number of overtime hours each driver worked.

As explained below, the court finds that Petersen's analysis commits this error, which ultimately undermines his entire damages calculation. The court, however, also notes that defendant's oblique reference to this error without providing any of its own support made the court's job considerably harder than it otherwise should have been.

### b.  Petersen Failed To Account For Paid Off-Duty Meal Breaks.

### i.  Drivers Were Off Duty During Meal Breaks.

It is undisputed that under the FLSA time spent during an "off-duty" meal break (whether paid or unpaid) does not count towards the 40 hour threshold for overtime. "The Supreme Court has held that time spent waiting for work is compensable if the waiting time is spent 'primarily for the benefit of the employer and his business.' Whether time is spent predominately for the employer's benefit is dependent upon all the circumstances of the case." Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers, 971 F.2d 347, 350 (9th Cir. 1992), as amended (Aug. 18, 1992) (citing Armour & Co. v. Wantock, 323 U.S. 126, 132 (1944) (internal quotation marks and citations omitted)). "Under the FLSA, the proper test of whether a break or meal period is excepted from FLSA overtime provisions focuses on whether the period was used predominantly or primarily for [the] benefit of [the] employer or for [the] benefit of the employee." Baumhover v. N. Bend Med. Ctr., Inc., No. 07-647C, 2008 WL 2874831, at *3 n. 3 (D. Or. July 22, 2008) (citing Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944); Aeromotive Metal Products, Inc. v. Wirtz, 312 F.2d 728 (9th Cir. 1963)).

Plaintiffs did not argue at trial that drivers were in fact "working" during their meal breaks. Indeed, at trial plaintiffs often suggested that drivers engaged in personal activities were on a "meal break" rather than a "rest break." See, e.g., Trial Tr. 324:16-325:4, 411:12-22.

Accordingly, the court finds that operators were "off duty" during their meal breaks. The court's determination regarding Petersen's analysis thus turns on whether drivers

14

were paid for meal breaks and, if so, whether Petersen's analysis took that properly into account.

**ii.**       **Open Top Provided Paid Off-Duty Meal Breaks.**

Rather than doing the more difficult work of sifting through the raw data to find direct evidence on this issue, the parties opted to argue over circumstantial evidence. The court begins by addressing that evidence and argument.

Arguing that Open Top did not pay drivers for their off-duty meal break, plaintiffs first point to Open Top's employee handbook that states "employees who work five hours or more may take a paid ten-minute break and an unpaid thirty (30) minute break, which should be scheduled with your supervisor." Exhibit 44 at 31; Trial Tr. 167:15-22 (admitting Exhibit 44).

Plaintiffs, however, omit that this Open Top policy only applies to "nonexempt and temporary employees." Exhibit 44 at 31. The court finds that it is at least plausible, if not likely, that this policy did not apply to the operators because Open Top treated drivers as exempt employees. Indeed, the present dispute arose because Open Top improperly characterized the operators as exempt for other purposes.

Further, Open Top's Head of Operations Jamie White testified that drivers "are paid for their lunches," Trial Tr. 399:11-17; 413:8-415:5, and that Open Top "pay[s] for all of our – our lunch breaks," Trial Tr. 410:6-18.

Plaintiffs argue that White's testimony is unpersuasive because it is in the present tense and is vague as to the type of payment drivers received for their meal break. The court is unpersuaded. As to the latter challenge, plaintiffs cannot call into question a witness' testimony by merely listing other forms of payment when no other form of payment was discussed at trial. With respect to plaintiffs' former argument, White testified that there was a logistics problem in ensuring operators clocked out for meal breaks. Trial Tr. 410:6-18. That problem would extend to any reduction in pay to account for meal breaks actually taken.

In addition, the court gives more weight to White's testimony about Open Top's

1    actual practice than an employee handbook policy that <u>might</u> have applied to the drivers

2    and which plaintiffs have already (effectively) discredited.

3           Plaintiffs next argue that Muse's paystubs and wage statements, which are

4    identical to other operator paystubs, do not indicate any payment for meal breaks.

5    Though true, this argument does not hold as much water as plaintiffs think. As shown

6    below, the paystubs do not indicate any meal break payment because Open Top paid its

7    drivers based on the total number of hours without distinguishing between time spent off

8    duty or on duty. Following this practice, it is not unexpected that Muse's wage

9    statements and paystubs do not show payments for off-duty meal breaks.

10          The court finds that the data in Exhibit 11 definitively confirms that the drivers were

11   paid for the entire time they were at work, including meal breaks.

12          Muse's payroll data in Exhibit 11 shows the following for the pay period 4/15/13 –

13   4/29/13:

| **Actual** | **In/Out** | **Reg** |
|---|---|---|
| Mon  Apr 15  08:06 AM | In | |
| Mon  Apr 15  07:37 PM | Out | 11.517 |
| Thu  Apr 18  07:57 AM | In | |
| Thu  Apr 18  05:14 PM | Out | 9.283 |
| Fri  Apr 19  07:33 AM | In | |
| Fri  Apr 19  06:33 PM | Out | 11.000 |
| Sat  Apr 20  07:19 AM | In | |
| Sat  Apr 20  07:34 PM | Out | 12.250 |
| Sun  Apr 21  08:28 AM | In | |
| Sun  Apr 21  08:57 PM | Out | 12.483 |
| **Weekly SubTotal** | | 56.533 |
| Mon  Apr 22  07:56 AM | In | |
| Mon  Apr 22  07:37 PM | Out | 11.683 |
| Thu  Apr 25  08:26 AM | In | |
| Thu  Apr 25  08:26 PM | Out | 12.000 |
| **Weekly SubTotal** | | 23.683 |
| | **Total** | **80.22** |

26          This data, which is generally representative of other operators' payroll data,

27   reveals a number of important details. First, the court understands this data to mean that

28   if an employee clocked in and out for a meal break, multiple in/out times would be shown

16

for a single day.  See also Woolfson Report ¶¶ 21, 24-25 (confirming the same); Bench

Tr. 8:3-20, 11:13-24 (Woolfson discussing reliance on time clock entries).  As is generally

true for the other payroll data in Exhibit 11, Muse clocks in and out once per day—i.e., at

the beginning and end of each work day.  Second, the number of hours recorded in the

"Reg" column matches the time shown under "Actual."  For example, on Monday April 15,

Muse clocked in at 8:06 A.M. and clocked out at 7:37 P.M., a total of 11 hours and 31

minutes.  Accordingly, the "Reg" column shows Muse's total hours were 11.517.  Third,

Muse's paystub for this pay period shows that he was paid for the same total number of

hours shown.  Ex. 33; Trial Tr. 171:1-23 (admitting Exhibit 33 during the jury trial).

Accordingly, because operators were off duty during meal breaks but were paid for

their entire workday, the court finds that the number of hours an operator was paid does

not equal the number of hours the operator "worked," as defined by the FLSA.

The next question, which the court answers in the negative, is: "Does Petersen's

analysis account for this key fact?"

### c. Petersen's Analysis Systematically Overestimates Overtime.

Petersen testified that he did not account for operators taking paid meal breaks.

Bench Tr. 66:1-70:19.  Shortly thereafter, Petersen confirmed that he "assumed that [the

drivers took] a half an hour unpaid meal break, so that's what I had in my analysis."

Bench Tr. 70:10-11.  That is, Petersen assumed that the number of paid hours matched

the number of hours worked.  Under this assumption, Petersen calculated each driver's

overtime premium by multiplying the number of "hours worked in excess of 40 during a

specific work week . . . by the hourly wage and then multipl[ied] that by .5."  Bench Tr.

36:5-11.  Petersen did not testify as to how he determined what constituted a "work" hour.

As explained above, Petersen's assumption is incorrect.  Open Top drivers were

paid for off-duty meal breaks.  To properly gauge the number of overtime hours worked,

Petersen could not base his analysis purely on how many hours over 40 an operator was

paid for each week.  Petersen should have based his calculation on the number of hours

a driver was paid in excess of 42.5 hours per week.  This is because the California Labor

17

Code requires that employers provide employees with a 30-minute off-duty meal break every 5 hours. Cal. Labor Code §§ 226.7, 512. Accordingly, if an operator is paid for his meal break, but does not work during his meal break, overtime should only be calculated for hours in excess of 8.5 paid hours per day. Hence, 42.5 hours per week.[3]

The payroll data and Muse's paystubs confirm that Petersen's calculation was based on the faulty assumption.

Exhibit 11 contains spreadsheets showing how many hours the operators worked and the number of hours per week. This data is sufficient—at least for some class members—to recreate the overtime compensation calculation that Petersen performed. The table below, for example, recreates Petersen's overtime calculation for Jimmy Walton's entire tenure at Open Top.[4]

| Pay Period | Check Start Date | Check Finish Date | $/hr | Week 1 Hours | Week 2 Hours | Week 1 OT Due | Week 2 OT Due | Total for pay period |
|---|---|---|---|---|---|---|---|---|
| 1 | 04/02/12 | 04/15/12 | $15.00 | 27.05 | 41.63 | $ -- | $12.23 | $12.23 |
| 2 | 04/16/12 | 04/29/12 | $15.00 | 33.25 | 41.55 | $ -- | $11.63 | $11.63 |
| 3 | 04/30/12 | 05/13/12 | $15.00 | 12.12 | | $ -- | $ -- | $ -- |
| 4 | 05/14/12 | 05/27/12 | $15.00 | 24.68 | 34.93 | $ -- | $ -- | $ -- |
| 5 | 05/28/12 | 06/10/12 | $15.00 | 30.12 | 31.33 | $ -- | $ -- | $ -- |
| 6 | 06/11/12 | 06/24/12 | $18.00 | 45.25 | 40.00 | $47.25 | $ -- | $47.25 |
| | | | | | Total | $47.25 | $23.86 | $71.11 |

As the table shows, Walton only worked more than 40 hours in a week on three occasions. The $71.10 amount of overtime due (based on 8.43 hours of overtime) matches Petersen's conclusion that Walton was owed $71 of overtime. Petersen Report Table 1. This confirms that Petersen calculated overtime based on 40 paid hours per week, rather than 40 hours worked per week.

---

[3] Even this is a slight over-simplification because if a driver is at work more than 10 hours per day then she would be entitled to an additional 30 minute off-duty meal break.

[4] The court was required to recreate Petersen's analysis and calculation because the court received no testimony on the underlying data, much less testimony on each operator's payroll history. The court further notes that Exhibit 11 also contains a conflicting spreadsheet that shows a 7th pay period where Walton worked 21.4 hours.

1    The above also shows how significantly this error affects Petersen's overtime

2 calculation.  If Walton worked a normal five day week and took five off-duty meal breaks,

3 and there is nothing to suggest he did not, then for week 2 of pay periods 1 and 2, he is

4 not entitled to any overtime because he actually only <u>worked</u> approximately 39 hours

5 during each of those weeks.  And for pay period 6, Walton only worked 2.75 hours of

6 overtime (45.25 hours - 2.5 hours).  Thus, properly taking into account off-duty paid meal

7 breaks, Walton is only owed $24.75 of overtime—about two-thirds less than Petersen's

8 calculated amount.

9    Muse's wage statements (the only wage statements admitted into evidence)

10 further confirm that Petersen failed to account for Open Top paying drivers for off-duty

11 meal breaks.  Muse's April 19, 2013 pay stub shows: 106.48 hours worked, $1810.16

12 paid (excluding commissions) between 04/01/13 and 04/14/13, and a $17/hour wage.

13 Exhibit 33.  Exhibit 11 shows that Muse "worked" 66.21 hours and 40.27 hours in week 1

14 and 2, respectively, of that pay period.  A total of 106.48 hours—the same amount Muse

15 was paid for, which, as discussed above, includes at least 5 hours of paid off-duty meal

16 breaks.

17    Petersen's analysis therefore fails to account for the off-duty meal breaks and,

18 therefore, systematically overestimates the amount of overtime due by at least 2.5 hours

19 per week that a driver "worked" over 40 hours.

20    The court cannot save Petersen's analysis by simply subtracting 2.5 hours from

21 each week an operator worked over 40 hours.  First, plaintiffs have not offered sufficient

22 testimony or evidence enabling the court to make the calculation.  Plaintiffs' evidence

23 regarding how many hours each driver worked per week is contradictory at best.

24 <u>Compare</u> Trial Tr. 185:5-10 (operator testifying he worked 10 to 16 hours a day six days

25 a week), Trial Tr. 197:16-18 (operator testifying he worked on average 70 hours a week),

26 Trial Tr. 208:5-10 (operator testifying he worked 12-14 hours a day six days a week), <u>with</u>

27 Bench Tr. 42:13-43:12 (Petersen testifying that on average during the payroll period

28 operators worked 48.73 hours per week).  Similarly, there is no testimony or summary

19

evidence showing for which weeks plaintiffs contend the drivers are due overtime. Further, though Exhibit 11 shows the payroll records for many drivers including weekly hours, it is voluminous, the multiple spreadsheets for each driver are sometimes inconsistent, and many of the records appear to be incomplete or insufficient to recreate the calculation. And the court has concerns about implementing the proper calculation based on Exhibit 11 alone because for some drivers the number of hours shown in that exhibit does not match the total overtime Petersen awarded. This implies that either Petersen or Woolfson took unexplained steps to arrive at the final overtime premium— steps that while possibly appropriate, the court is unable to recreate without guidance. See, e.g., Bench Tr. 21:6-25:5 (Woolfson describing some process where payroll and timesheet data is analyzed and a formula applied to determine a final number of hours worked.); Bench Tr. 8:3-20 (Woolfson describing that he generally obtains data and "normalize[s] it.").

Second, testimony on the records shows that many drivers worked more than ten hours per day. As noted above, on those days California law required Open Top to provide an additional off-duty meal break that, based on Open Top's practice, drivers would be paid for. Accordingly, for each of those days an additional half-hour set-off should be calculated. This compounds the problems discussed above.

Third, even if the court had sufficient weekly information for each driver, the court could not simply subtract 2.5 hours per week that overtime was worked because that would fail to account for weeks where a driver worked a sixth day. In those weeks, the court would be required to subtract 3 hours per week for paid off-duty meal breaks.

Fourth, the court has no information about whether some drivers held positions that were actually overtime exempt as well as driving positions that were not overtime exempt. There is evidence that is the case for at least some drivers. This would also affect the amount of overtime due per week.

In sum, Petersen's overtime calculation systematically overestimates the amount of overtime due and even if the court were inclined to do plaintiffs' work for them, the

United States District Court
Northern District of California

court does not have sufficient information to do so.

### d. The Paid Off-Duty Meal Break Error Infects Other Parts of Petersen's Calculations.

Petersen's systematic overestimation also creates problems with Petersen's other calculations.

Both the prejudgment interest and liquidated damages calculation rely on Petersen's overtime totals. Petersen testified that he calculated prejudgment interest by "taking the date when the overtime was due, and [ ] calculate[ing] the number of years until the present. And then [ ] multiply[ing] that number by the amount of overtime due as of that date and then multiply that number by 10 percent." Bench Tr. 52:5-20. Because Petersen's "overtime due" amount is inaccurate, so is his calculated prejudgment interest amount.

Petersen's liquidated damages calculation cannot be relied upon for the same reason. See Bench Trial Tr. 69:23-70:18 (conceding that liquidated damages would be reduced if overtime payments were reduced). Petersen explained that "liquidated damages should be an amount equivalent to the overtime wages due for the FLSA members."[5] Bench Tr. 41: 4-6. Specifically, for the 29 FLSA collective action members, Petersen went back three years from the date that each member's opt-in form was filed and "add[ed] up the [ ] damages for the overtime payments that [were] already computed" for overtime premium due. Bench Tr. 38:23-39:8. Hence, Petersen's $114,524 liquidated damages amount is also unreliable.

Further, the above discussed error permeates through to Petersen's California Labor Code § 226(a) and § 2699 penalty calculations. It does not, however, fatally undermine his § 203 calculation.

---

[5] An employer who violates the FLSA shall be liable for "the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C § 216(b). Where, as here, the employer's violation was "willful" a three-year statute of limitations applies. 29 U.S.C. § 255(a); Dkt. 220 (finding Open Top's violation of the FLSA was "willful").

With regards to §§ 226(a) and 2699, an example derived from Exhibit 11 illustrates the scope of the problem succinctly. For the pay period 12/08/14 to 12/21/14, Muse worked 30.08 hours the first week and 42.15 hours the second week. Ex. 11. Under Petersen's calculation, Muse would be due 2.15 hours of overtime pay (or $20.42) for that pay period.[6] See Ex. 33. Because Muse's paystub for this period failed to include this overtime, Petersen also would have awarded Muse both a civil penalty under § 2699 of $200 and a statutory penalty under § 226 of $100. Thus, using Petersen's calculation, Muse would be entitled to penalties and overtime totaling $320.42 for this pay period.

But, as discussed at length above, taking into account paid off-duty meal breaks of 2.5 hours per week, Muse did not work any overtime during this pay period. Therefore, there was neither overtime due nor an inaccurate wage statement and Open Top should owe nothing to Muse based on this pay period.

On the other hand, Petersen's § 203 Waiting Time Penalty calculations are largely unaffected. Under § 203, "If an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." Cal. Labor Code § 203. Exhibit 78, admitted into evidence during the bench trial, is Open Top's interrogatory responses regarding each operator's termination date or dates. Bench Tr. 55:14-56:24 (admitting Exhibit 78 into evidence); Ex. 78 (showing each operator's termination date or dates, if hired and terminated multiple times). Petersen attested that he relied on this data to calculate § 203 waiting time penalties. Bench Tr. 55:18-22. If an employee was owed any wage, including overtime, upon the employee's termination, Petersen calculated § 203 penalties "based on the formula of number of days up to 30, times 8 hours per day, times the average wage during the employment period." Bench

---

[6] Muse received a pay increase between this pay period and the previously discussed pay period.

Tr. 46:2-20. This calculation only required Petersen to determine whether, at some point during the employee's time at Open Top, the employee was not paid for overtime worked. Though Petersen made this determination based on a 40 hours per week threshold, the court finds it more likely than not that the same class members met the applicable 42.5 hour per week threshold discussed above at least once during their tenure at Open Top. Accordingly, Petersen's § 203 calculation need not be thrown out based on the paid off-duty meal break error.

> **e.** **Petersen's Inferential Statistical Methodology Is Questionable for Additional Independent Reasons.**

As noted above, Petersen used an inferential statistical method for those class members who worked during the non-payroll period. The court finds that there are also a number of reasons, independent from the above, to question this analysis.

First, for those drivers who worked very few days during the non-payroll period but a significant number of days during the payroll period, Petersen used the overall average number of overtime hours worked rather than that driver's actual payroll period average. For example, Hanming Wu worked one month during the non-payroll period and worked about 20 weeks during the payroll period. Ex. 11 (paycheck report for Wu between 3/21/2011 and 8/7/11). Petersen calculated that Open Top owed Wu $2,440 for overtime worked during the payroll period. Petersen Report Table 1. On average during this period, Wu worked 53.91 hours of per week or, under Petersen's calculation, 13.91 hours of overtime. Rather than using that average to calculate the amount Wu was owed for the one-month period where payroll data was not available, Petersen used 8.73 hours per week, the overall average number of overtime hours Open Top drivers worked per week during the non-payroll period. Petersen Report Table 3 (awarding Wu $275). As is clear from the above, using the overall average rather than Wu's individual average potentially underestimates Wu's overtime worked during the non-payroll period by 50% per week.

Second, neither plaintiffs nor Petersen explained why Petersen projected overtime

23

due for four people who worked during the payroll period. For one of these people, Huber Ochoa, the projected overtime due is negligible because he only worked three weeks during the payroll period. Petersen Report Table 3. However for the other three, Steven Rohner (5 months), James Ratchford (3.27 years), and Paul Bolich (6.41 years, 4 years in the payroll period), the projected overtime due is not at all negligible, $1,523, $12,617, and $24,759, respectively. Id. Though Petersen testified that his inferential method also included drivers where no payroll data was available, neither Petersen nor plaintiffs offered any explanation regarding why payroll data was not available for these three drivers, making up almost eight years' worth of pay periods. See Petersen Report at 4 ("Payroll data was supplied by Defendant for 88 of the Rule 23 class members. This payroll data appears to be complete for the Period March 7, 2011 to April 30, 2017."). The court finds that the presence of these four drivers on the "projected" list requires explanation and, without testimony explaining the discrepancy, undermines Petersen's analysis.

Third, as discussed above, Petersen provided inconsistent testimony regarding the number of drivers for which he used the inferential method to calculate overtime. See Bench Tr. 44:2-22 (22 individuals); Bench Tr. 92:23-93:6 (eighty-eight out of ninety-six had payroll data available); Petersen Report Table 3 (Titled "Overtime Wages Due Class Members Where No payroll Data is Available;" showing that 16 class members had payroll data missing); Petersen Report Table 4A, 7 (same). The court finds that this inconsistent testimony also undermines Petersen's inferential methodology. Similarly, the court finds Petersen's testimony unreliable because though he testified the inferential method was not used for eighty-eight out of ninety-six drivers, see Bench Tr. 92:17-93:5, Petersen's own expert report explicitly contradicts the statement, see Petersen Report Table 1, 3 (showing 8 drivers appearing on both the payroll period table and the non-payroll period table).

Lastly, Petersen testified that in performing his inferential analysis, he reduced the average yearly overtime due from $4,286 to $3,863 to account for the difference in

average pay between the 2009-2011 non-payroll period ($17/hour) and the 2011-2016 payroll period ($18.86/hour).  Bench Tr. 42:3-43:5.  For drivers who worked during the non-payroll period, this makes sense.  However, when projecting for the four above-mentioned employees, all of whom worked during the payroll period, Petersen still used the lesser non-payroll period average (i.e., $3,863), instead of the average applicable to the years the drivers actually worked (i.e., $4,286).

### 2. There Is No Direct Evidence On The Total Number of Statutory and Civil Violations.

The jury did not determine the number of violations and neither of plaintiffs' bench trial witnesses testified about the number of violations.  For reasons similar to those discussed above with respect to recalculating overtime, Exhibit 11 does not have enough data for the court to be sure that it is making a non-arbitrary calculation.  Accordingly, the court cannot calculate the total penalties the operators are due under § 226 and § 2699.  Muse is the single exception because plaintiffs submitted his paystubs into evidence.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Rest Break Claim

The jury found for defendant on plaintiffs' rest break claim.  Plaintiffs take nothing.

### B. Restitution Under the UCL

On May 24, 2017, the court granted plaintiffs' motion for summary judgment on this claim and concluded a four-year statute of limitations applies.  The parties have stipulated that UCL overtime restitution is $410,000.  See Dkt. 224.  Rule 23 plaintiffs are awarded the amount of $410,000.[7]

### C. FLSA Overtime and Liquidated Damages

---

[7] Defendant argues that the award for James Ludwig should be reduced because Ludwig spent time as a revenue protection agent as well as a driver and he may have been paid overtime in that position.  Trial Tr. 197:1-6, 300:2-13 (Andrew Smith confirming the same).  Defendant has not pointed to any evidence establishing whether Ludwig was paid overtime.  The court finds that defendant's unsupported argument is insufficient to reduce Ludwig's overtime or prejudgment interest award.

In light of the court's summary judgment ruling and the jury's verdict that the defendant's violation of the FLSA was willful, a three-year statute of limitations applies to plaintiffs' unpaid overtime claim. Plaintiffs may also recover liquidated damages equal to the same. 29 U.S.C. § 216(b); Dkt. 154, Summary Judgment Order, at 18. The UCL overtime restitution, however, subsumes FLSA overtime damages, and plaintiffs do not seek double recovery. Bench Tr. 61:17-62:2 ("We are not seeking double recovery . . . the FLSA overtime is already covered by the UCL restitution."). Therefore, only liquidated damages are at issue.

At trial plaintiffs were required to prove liquidated damages. Petersen calculated that the 29 collective action members were owed $114,524 in liquidated damages, calculated based on overtime wages over a three year period.

As discussed, the court cannot rely on this amount because it depends entirely on Petersen's flawed overtime calculation. Thus, the FLSA collective action members take nothing for their liquidated damages claim.

### D.     Prejudgment Interest Under the UCL

Plaintiffs seek prejudgment interest totaling $166,195 on the Rule 23 class members' UCL restitution recovery.[8] During the bench trial, the only evidence plaintiffs presented on this issue was Petersen's testimony. See Petersen Report Table 6 (showing prejudgment interest for drivers during the period where payroll data was available, totaling $129,052), Table 7 (showing prejudgment interest for drivers during the period where payroll data was not available, totaling $37,143). Petersen calculated prejudgment interest by taking the date when the overtime was due and calculating the number of years until the present, then multiplying that number by the amount of overtime due as of that date and by 10 percent. Bench Tr. 52:11-20. This calculation used Petersen's overtime award totaling $366,302, not the later-stipulated to amount of

---

[8] Plaintiffs argued that prejudgment interest and liquidated damages could be awarded to FLSA collective action members. In light of the court's finding that the liquidated damages amount is unascertainable, this argument is moot as to liquidated damages.

$410,000.  Bench Tr. 36:12-15.

The court finds that it cannot award prejudgment interest totaling $166,195 because that amount is based on Petersen's flawed overtime calculation.  However, the court finds that the Rule 23 class members are entitled to prejudgment interest totaling $130,217.26.  This amount is based on the court's own calculation which, as explained below, applies a 7% per annum interest rate to the stipulated $410,000 overtime amount.

### 1.    A Seven Percent Per Annum Interest Rate Is Appropriate.

Plaintiffs argue that under Labor Code § 218.6 and Cal. Civ. Code. § 3289(b) the court should apply a 10% interest rate.

- **Labor Code § 218.6:** "In any action brought for the nonpayment of wages, the court shall award interest on all due and unpaid wages at the rate of interest specified in subdivision (b) of Section 3289 of the Civil Code, which shall accrue from the date that the wages were due and payable as provided in Part 1 (commencing with Section 200) of Division 2."
- **Civ. Code § 3289(b):** "If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."

In short, plaintiffs argue that their UCL claim is an action brought for the nonpayment of wages and that therefore § 3289(b)'s 10% interest rate applies.

The court disagrees.  "Plaintiffs have brought a claim for unfair competition; simply because such action is predicated on defendants' conduct in wrongfully withholding wages does not make the action one for nonpayment of wages.  The action is still one for unfair competition."  Wallace v. Countrywide Home Loans Inc., No. SACV 08-1463-JST, 2013 WL 1944458, at *9 (C.D. Cal. Apr. 29, 2013) (addressing the proper calculation of overtime compensation in a UCL claim predicated on an FLSA violation).

At least one California appellate court agrees with this analysis.  In Californians for Population Stabilization v. Hewlett-Packard Co., 58 Cal. App. 4th 273 (1997) abrogated on other grounds by Cortez v. Purolator Air Filtration Prod. Co., 23 Cal. 4th 163 (2000), a public interest organization brought a UCL claim against several defendants, seeking injunctive relief based in part on alleged violations of minimum wage laws, failure to compensate for all hours worked, and unlawful deductions from wages.  Hewlett-Packard

Co., 58 Cal. App. 4th at 278-79, 290–292.  The issue before the court was whether the successful defendant could claim attorneys' fees under § 218.5, which provides for attorneys' fees to the prevailing party in "any action brought for the nonpayment of wages."  Id. at 295.  The trial court denied the request for attorneys' fees pursuant to Labor Code § 218.5.  Id. at 294.  The Court of Appeal affirmed, concluding fees were unavailable under § 218.5 because the UCL action was not brought for the nonpayment of wages, but for unfair competition.  Id. at 295.

As in Wallace and Hewlett-Packard, plaintiffs here claim prejudgment interest for damages recovered under their UCL claim, which is an unfair competition claim. Accordingly, neither Cal. Labor Code § 218.6 nor Civ. Code § 3289(b)'s 10 percent interest rate applies.

"In the absence of a rate set by the Legislature, Article XV, Section 1 of the California Constitution states that the rate of interest shall be 7% per annum."  Wallace, 2013 WL 1944458, at *9; Ulin v. Lovell's Antique Gallery, 2011 WL 2443676, at *2 (N.D. Cal. June 15, 2011) (applying 7% interest rate to a UCL claim).  The court also finds a 7% per annum interest rate is appropriate.[9]

**2.    The Court's Prejudgment Interest Calculation.**

Using a 7% per annum simple interest rate and the stipulated $410,000 UCL overtime amount, the court awards Rule 23 class members a total of $130,217.26.  Each individual class member's prejudgment interest award is shown in Appendix A to this order.

---

[9] The cases plaintiffs cite are not to the contrary.  Ridgeway v. Wal-Mart Stores Inc., No. 08-CV-05221-SI, 2017 WL 363214, at *4 (N.D. Cal. Jan. 25, 2017) (distinguishing Wallace and Ulin because they involved UCL claims predicated on federal law and applying 10% interest rate to UCL claim predicated on California law); Egelhoff v. Pac. Lightwave, No. CV1204745RGKDTBX, 2013 WL 12125433, at *3 (C.D. Cal. Nov. 20, 2013) (applying 10% interest rate to a claim brought under California law); Muan v. Vitug, No. 5:13-CV-0331-PSG, 2014 WL 1410209, at *7 (N.D. Cal. Apr. 11, 2014) (applying 10% to FLSA claim but plaintiffs had abandoned their UCL claim); Fenglin Zhang v. Aicem Grp., LLC, No. 13-CV-1342 KAW, 2014 WL 12678026, at *9 (N.D. Cal. Jan. 28, 2014) (on default judgment, assuming without discussing that § 3289(b) and § 218.6 apply).

United States District Court
Northern District of California

The court's calculation matched Petersen's method of calculating simple interest. Specifically, the court calculated prejudgment interest by taking the date when the overtime was due and calculating the number of years until trial, then multiplying that number by the amount of overtime due as of that date by 7 percent. However, nothing in evidence directly spoke to the date overtime was due for each driver, i.e., the number of years the overtime was due ("years due"). Similarly, though the court had the total stipulated overtime amount of $410,000, the parties did not submit any evidence regarding how that would be apportioned between individual class members. The court took additional steps to fill in the blanks.

First, the court calculated "years due" by reversing Petersen's overtime and prejudgment interest calculation for each driver. As discussed, Petersen calculated prejudgment interest by multiplying total overtime by "years due" and multiplying that number by 10%. That is,

$$Interest = OT \times 10\% \times \text{"}Years\ Due\text{"}$$

For drivers in the payroll period, Table 1 and Table 6 of Petersen's supplemental expert report show each driver's overtime due and prejudgment interest due, respectively, as calculated using Petersen's methodology. The same is true for Tables 3 and 7, showing the amount due to non-payroll period drivers. Using each driver's overtime and prejudgment interest due and the 10% interest rate, the court determined the "years due" input. For example, for the payroll period Petersen awarded Juan Alcaron overtime of $7,590 and prejudgment interest of $4,345.

$$\$4,345 = \$7,590 \times 10\% \times \text{"}Years\ Due\text{"}$$

$$5.72 = \text{"}Years\ Due\text{"}$$

Second, because the court had no information about how much each driver was due under the new overtime amount, the court used a proportional method to determine this missing value. Specifically, the court determined each driver's overtime award as a percentage of Petersen's total overtime award ($366,302) and then multiplied that percentage by the stipulated $410,000 amount. Continuing the example above,

$$\$7,590 \div \$366,302 = 2.07\% \text{ and } 2.07\% \times \$410,000 = \$8,495.00.$$

For the purposes of calculating prejudgment interest, the court finds this proportional method to be a fair and reasonable approximation. The court recognizes that this proportional method may not be one-hundred percent accurate because the increase from $366,302 to $410,000 may not be spread evenly across all drivers. However, nothing on the record suggests the increase is spread disproportionately. Further, the court notes that it is not inconsistent to rely on Petersen's overtime premium award to calculate each driver's proportional award because Petersen's above-described error would have likely affected each driver approximately equally.

With these two blanks filled in, the court performed the prejudgment interest calculation described above for each driver. For example, completing the calculation for Alcaron:

$$Interest = OT \times 7\% \times \text{"Years Due"}$$

$$Interest = \$8,495 \times 7\% \times 5.72$$

$$Interest = \$3,401.40^{[10]}$$

Adding each driver's prejudgment interest award totals $130,217.26.

### E. Inaccurate Wage Statements

Plaintiffs seek to recover statutory and civil penalties under §§ 226 and 2699, respectively, for Open Top's issuance of inaccurate wage statements.

The jury rendered its verdict that Open Top knowingly and intentionally failed to provide the operators with wage statements that included Open Top's full legal name. The jury also found that Open Top knowingly and intentionally failed to provide operators with wage statements that set forth all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the

---

[10] The court notes that this number is different than the amount awarded Alcaron in Appendix A because the amount in Appendix A reflects prejudgment interest awarded for overtime worked during the payroll period plus prejudgment interest awarded for overtime worked during the non-payroll period, and this calculation covers only the payroll period.

United States District Court
Northern District of California

employee. The plaintiffs, however, did not request nor did the jury make any findings as to how many discrete violations of §§ 226 or 2699 occurred, and plaintiff Muse's wage statements were the only wage statements received into evidence.

During the bench trial, plaintiffs introduced expert testimony on the total amount of penalties due each driver under § 226 and § 2699 based on the wage statements' failure to accurately reflect overtime worked. Plaintiffs, however, again presented no evidence on the total number of violations of these two sections.

### 1. The Wage Statements' Failure To Show Open Top's Full Legal Name.

Despite the jury's verdict in plaintiffs' favor on this issue, during the bench trial no evidence or testimony was presented regarding penalties under § 226 or § 2699 for Open Top's failure to include its full legal name on the operators' wage statements. Accordingly, plaintiffs take nothing under this theory of plaintiffs' § 226 and § 2699 claims.

### 2. The Wage Statements' Failure To Reflect Overtime.

Based on Petersen's testimony, plaintiffs seek to recover penalties under § 226 totaling $74,950 and under § 2699(f)(2) totaling $177,500 for the period November 26, 2012, through April 20, 2016. Bench Tr. 47:10-14, 49:16-50:6. Petersen calculated the § 226 total using the following formula: "$50 for initial pay period violation and $100 per pay period for subsequent pay period violations up to a maximum of $4,000 per individual." Petersen Report ¶ 31; Bench Tr. 46:2-47:24, 77:22-78:2 (referencing ¶ 31). The same description was given for § 2699 but with penalties at $100 for the initial pay period violation and $200 for each subsequent pay period violation. Petersen Report ¶ 31; Bench Tr. 46:2-47:24, 77:22-78:2 (referencing ¶ 31). On cross examination, Petersen confirmed that he assessed the lower penalty for the "first violation and all other violations were" assessed at the higher amount. Bench Tr. 81:22-82:6.

For the reasons discussed above, Petersen's penalty calculations under these two sections are unreliable. Further, for all except one driver, there is no direct evidence that supports awarding penalties under these sections because plaintiffs submitted neither the wage statements themselves nor testimony about how many of each driver's wage

statements failed to reflect overtime worked.

The one exception is Muse. At trial, plaintiffs submitted a complete set of Muse's paystubs for the relevant time period. <u>See</u> Ex. 33. Based on those paystubs and using an 85 hour per two-week pay period threshold, the court finds Muse's wage statements were inaccurate and violated § 226 and § 2699 forty-eight times during the relevant period. As explained below, the court holds that the "initial" and lower penalty applies to all violations. Accordingly, for each violation, the court awards Muse $50 under § 226 and $100 under § 2699(f)(2), totaling $2,400 and $4,800, respectively.

Though there is no direct evidence on the matter the court finds that Open Top violated § 226 and § 2699 an additional eighty times. This finding is supported by the parties' stipulated undisputed facts that Open Top's wage statements displayed neither the applicable overtime rates nor reflected that all hours above 40 hours in a week were overtime hours. Dkt. 165 at 4. Given these two stipulated facts, any driver who worked overtime during the relevant period almost necessarily received at least one wage statement that was inaccurate because it failed to reflect that overtime worked. The court finds it more likely than not that those 80 drivers whom Petersen calculated were due an overtime premium, <u>see</u> Petersen Report Tables 1 & 3, worked overtime at least one week during the relevant period.[11] Accordingly, the court finds an additional 80 violations of § 226 and § 2699, and awards $4,000 and $8,000 in statutory and civil penalties, respectively.

During the bench trial and in the post-trial briefing, the parties disputed whether §§ 226 and 2699(f)(2)'s "initial" violation rate applies to only the first violation or whether that lower rate can apply to all violations. Neither party cites any controlling authority on this issue nor could the court find any. As explained below, the court holds that in this case the "initial" violation rate applies to all violations of § 226 and § 2699.

Resolution of this issue depends on the language of the statutes:

---

[11] This number excludes violations based on Muse's wage statements.

Section 226(e). "An employee suffering injury as a result of a knowing and intentional failure by an employer to comply . . . is entitled to recover the greater of all actual damages or fifty dollars ($50) for the <u>initial pay period</u> in which a violation occurs and one hundred dollars ($100) per employee for each violation in a <u>subsequent pay period</u> . . . ." (emphasis added).

Section 2699(f). "[T]he civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the <u>initial violation</u> and two hundred dollars ($200) for each aggrieved employee per pay period for each <u>subsequent violation</u>." (emphasis added).

In <u>Amaral v. Cintas Corp.</u>, 163 Cal. App. 4th 1157, 1209 (2008), a California appellate court addressed the meaning of the same terms—"subsequent" and "initial"—appearing in §§ 210 and 225.5. In both of these sections, like § 2699, "initial" and "subsequent" modify violation and not "pay period." Comparing the internal wording of those statutes, <u>Amaral</u> reasoned that:

> The statutes state that a penalty for an initial violation is to be imposed "for each failure to pay each employee." This language conveys two things. First, by specifying a $50 penalty must be imposed "for <u>each</u> failure to pay each employee" ([emphasis] added), the language contemplates that an "initial violation" can result in more than one penalty at the $50 level. . . . Second, because the statutory language contemplates the imposition of repeated penalties for each pay period that an initial violation continues, a "subsequent" violation (which carries a double penalty) must refer to something other than an underpayment that occurs after the first pay period. Although common sense might suggest a "subsequent" violation is nothing more than a violation that occurs at a later point in time after an "initial" violation, this definition is inadequate because the statutes provide for multiple penalties for "each failure to pay each employee" incurred in an initial violation.

<u>Amaral</u>, 163 Cal. App. 4th at 1209 (internal citations omitted). The <u>Amaral</u> court ultimately agreed with the Department of Labor Standards and Enforcement's interpretation and concluded:

> Until the employer has been notified that it is violating a Labor Code provision (whether or not the Commissioner or court chooses to impose penalties), the employer cannot be presumed to be aware that its continuing underpayment of employees is a 'violation' subject to penalties. However, after the employer has learned its conduct violates the Labor Code, . . . [it] will be punished at twice the rate of penalties that could have been imposed or that were imposed for the initial

violation.

Id.

The court finds this reasoning persuasive and federal courts in this Circuit frequently rely on this holding to interpret other sections of the Labor Code. See, e.g., In re Taco Bell, 2016 WL 2755938, at *7-8 (relying on Amaral for § 2699); Hernandez v. Best Buy Stores, LP, No. 13CV2587 JM (KSC), 2017 WL 2445438, at *2 (S.D. Cal. June 6, 2017) (same); Amalgamated Transit Union Local 1309, AFL–CIO v. Laidlaw Transit Servs., Inc., 2009 WL 2448430, at *9 (S.D. Cal. Aug. 10, 2009) (rejecting plaintiffs' conflation of willfulness and "subsequent violation" and applying Amaral to § 558(a)); Willis v. Xerox Bus. Servs., LLC, No. 1:13–CV–01353–LJO, 2013 WL 6053831, at *6 (E.D. Cal. Nov. 15, 2013) (applying Amaral's reasoning to §§ 210 and 226.3).

Pointing to Garnett v. ADT LLC, 74 F. Supp. 3d 1332, 1334 (E.D. Cal. 2015), plaintiffs argue that the court should give deference to the plain meaning of §§ 226 and 2699, which, according to plaintiffs, requires the lower penalty amount be applied to the first payroll period and the higher penalty be applied to all subsequent payroll periods.

In Garnett, the court considered whether the action met CAFA's $5 million dollar amount in controversy requirement. Garnett v. ADT LLC, 74 F. Supp. 3d 1332, 1334 (E.D. Cal. 2015). While plaintiffs brought numerous claims, the parties only addressed whether statutory penalties under § 226(e) exceeded $5 million. See id. at 1337 n.4. Rejecting plaintiffs' argument that the enhanced penalties did not apply because defendant had not previously been put on notice, the court found that Amaral's reasoning did not apply to § 226. Id. at 1336.

The Garnett court reasoned that unlike §§ 210, 225.5, and 2699 in which "subsequent" and "initial" modify "violation," in § 226 "subsequent" and "initial" modify "pay period." Id. at 1335-36. This, in the Garnett court's mind, distinguished Amaral's reasoning because Amaral concluded there could be multiple "initial violations." Id. Amaral, according to the Garnett court, did not reason that there could be multiple "initial pay periods." Buttressing its decision not to apply Amaral, Garnett pointed out that §§

210 and 225.5 state "for each subsequent violation, or any willful or intentional violation" the enhanced penalty applies. Id. at 1336. In contrast, § 226 already predicates liability upon a "knowing and intentional failure" to comply with the section.

As a whole, the court does not find Garnett's reasoning persuasive. To establish "knowing and intentional" conduct under § 226(e), plaintiffs must demonstrate that defendants were "aware of the factual predicate underlying the violation[s]." Novoa v. Charter Commc'ns, LLC, 100 F. Supp. 3d 1013, 1029 (E.D. Cal. 2015) (discussing the topic at length). However, "[p]laintiffs are not required to demonstrate that defendants knew their conduct was unlawful." Cabardo v. Patacsil, 248 F. Supp. 3d 1002, 1010 (E.D. Cal. 2017).

Given this distinction between "knowing and intentional" and "willful," Amaral's reasoning applies with equal force to § 226 violations. To even get in the door on a § 226 violation, plaintiffs must show that the defendant knew its wage statements contained the alleged inaccuracies. In this case, that defendant knew overtime was not reflected on the wage statements. But the defendant "will be punished at twice the rate of penalties that could have been imposed or that were imposed for the initial violation" only once "the employer has learned its conduct violates the Labor Code" then "any future violations will be punished just the same as violations that are willful or intentional." Amaral, 163 Cal. App. 4th at 1209. Here, defendant knew that its drivers' paystubs did not show overtime, but there is nothing in the record showing Open Top was previously notified that this practice violated § 226. Accordingly, the court applies the "initial" penalty to each violation of § 226 and § 2699(f)(2).

## F. Waiting Time Penalties

On May 24, 2017, the court granted plaintiffs' motion for summary judgment on Open Top's liability on the waiting time penalties claim under § 203. Dkt. 154. During the bench trial, plaintiffs presented expert testimony on the amount of applicable penalties under § 203 and § 2699. Specifically, Petersen testified plaintiffs were due $311,417 under § 203 and $7,400 under § 2699. Bench Tr. 48:2-49:8. As explained below, the

court finds that plaintiffs are entitled to the § 203 award but are not entitled to the § 2699 award.

### 1. Statutory Penalties Under Labor Code § 203

Section 203 provides that "[i]f an employer willfully fails to pay . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid" but for not more than 30 days. Cal. Labor Code § 203(a). The California Supreme Court has interpreted this to be a statutory penalty. Iskanian v. CLS Transp. Los Angeles, LLC, 59 Cal. 4th 348, 381 (2014).

As explained above, unlike the other Labor Code sections at issue in this case, Petersen's § 203 damages calculation is not fatally affected by the unpaid off-duty meal break error. Accordingly, the court finds and awards plaintiffs $311,417 in statutory penalties under § 203, in accordance with Column 1 of Table 4 and 4A as attached to Petersen's Supplemental Expert Report.

### 2. PAGA Penalties Sought under § 2699(f)

The court concludes that plaintiffs are not entitled to any civil penalties under § 2699 for violations of § 203. Plaintiffs seek $7,400 for civil penalties under § 2699, Bench Tr. 63:17-23, which provides the above discussed civil penalty "[f]or all provisions of [the Labor Code] except those for which a civil penalty is specifically provided." Cal. Labor Code § 2699(f). However, the civil penalty for § 203 violations is specifically provided for by § 256: "The Labor Commissioner shall impose a civil penalty in an amount not exceeding 30 days' pay as waiting time under the terms of Section 203." Cal. Labor Code § 256; see also Iskanian, 59 Cal. 4th at 381 (noting that § 256 provides for the civil penalty for a § 203 violation); Gaasterland v. Ameriprise Fin. Serv., 16-3367C, 2016 WL 4917018, at *6-7 (N.D. Cal. Sept. 15, 2016) (using § 256 to calculate civil penalties in a motion to remand context). As plaintiffs have moved under the wrong statute and have not presented any argument for civil penalties under the correct statute, the court awards no civil penalties under § 2699 for violations of § 203.

United States District Court
Northern District of California

**G.    Injunction**

Plaintiffs requested that the bench trial include a determination of whether injunctive relief should issue.  There was no argument at either the jury or bench trial on this issue.  The court thus DENIES plaintiffs' request for injunctive relief.

**H.    Fees and Costs**

Any party may file their/its application for fees and costs associated with <u>only</u> those claims for which they/it were the prevailing party, pursuant to and as provided by applicable statutes and rules.

**IT IS SO ORDERED.**

Dated: February 14, 2018

_____
PHYLLIS J. HAMILTON
United States District Judge